UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN FRANKLYN,

     Plaintiff,

v.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION; NATIONAL ASSET
ADVISORS, LLC; HARBOUR PORTFOLIO
VI, LP; RECA PROPERTIES, LLC;
WELTMAN, WEINBURG, AND REIS, CO.,
LPA; and WILLIAM CLOS,

     Defendants.

Case No. 14-cv-10943
Honorable Laurie J. Michelson
Magistrate Judge David R. Grand

---

**OPINION AND ORDER GRANTING IN PART
(1) WELTMAN, WEINBURG, AND REIS, CO., LPA'S MOTION TO DISMISS [7],
(2) WILLIAM CLOS' MOTION TO DISMISS [8], AND
(3) FEDERAL NATIONAL MORTGAGE ASSOCIATION'S MOTION FOR
JUDGMENT ON THE PLEADINGS AND FOR SUMMARY JUDGMENT [27]**

---

Plaintiff Kevin Franklyn has filed a 57-page, pro se complaint against six defendants alleging eighteen causes of action based on events stemming from his purchase of a house. Defendants Weltman, Weinburg, and Reis, Co., LPA ("WWR") and William Clos say that Franklyn's claims against them fail to state a claim for relief and thus should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkts. 7, 8.) Defendant Federal National Mortgage Association ("Fannie Mae") filed an answer but now moves under Rules 12(c) and 56 for judgment on the pleadings and summary judgment. (Dkt. 27.) Having reviewed the motions and associated briefing, the Court will proceed without oral argument. *See* E.D. Mich. LR 7.1(f). For the reasons that follow, WWR's, Clos', and Fannie Mae's motions will be granted in large part and denied in part.

**I.**

**A.**

Because Defendants seek judgment on the pleadings, the following summary presents as fact the non-conclusory allegations of Franklyn's Complaint (to the extent they can be deciphered).

In "early 2011," Franklyn saw a for-sale sign posted on a house on 14617 Penrod in Detroit, Michigan ("Property"). (Compl. at 3.) The sign stated that monthly payments would be under $400 and provided a number to call if interested. (*Id.*) Franklyn called the number and someone associated with Defendant RECA Properties answered, checked Franklyn's qualifications, and then gave Franklyn a code to the lock on the door. (Compl. at 3–4.) Franklyn was also informed that if he liked the house, he should call back and would be dealing with Defendant Harbour Portfolio VI. (*Id.*)

Franklyn was interested in the property and sent an application packet and a $1,000 deposit to "Defendants[]." (Compl. at 4.) On February 24, 2011, Franklyn entered into a mortgage with "Defendants[]." (*Id.*) But Franklyn notes that Harbour Portfolio did not have a license to do business in Michigan until "mid-2011." (Compl. at 5.)

Franklyn attempted to record the "Agreement for Deed/mortgage" but the register of deeds refused because Franklyn did not have the original. (Compl. at 4.) Franklyn then contacted "Defendants[]"; they told him "it was not their policy to register deeds with the county until the contract had been paid off." (Compl. at 4.)

In January 2013, "the Defendants[]" sent Franklyn a tax form (1098 INT), which led Franklyn to "read the contract more closely and he concluded that the contract contained a loan, which was secured by a mortgage." (Compl. at 5.) According to Franklyn, "[t]he contract on its

2

face, appeared to be an agreement for deed, then a mortgage with a loan, then it also had a rental agreement." (*Id.*) The mortgage and associated loan documents are not part of the Complaint, nor has WWR, Clos, or Fannie Mae attached them to their motions.

In February 2013, Franklyn "was given a loan modification agreement." (Compl. at 5.)

Also "early in 2013" Franklyn was informed that the Property was located in "an empowerment zone" and thus eligible for a tax break based on certain improvements, including those Franklyn had made to the Property (e.g., thirty-year roof shingles). (Compl. at 6.) Franklyn tried to reduce his taxes in 2013, but learned that he could not negotiate his taxes due to the fact that the taxes on the Property were not "listed in his name." (Compl. at 7.) "The taxes for real property payable to the [C]ity of Detroit were and are currently listed as of January 2014 [as] paid by Fannie Mae." (Compl. at 7.) Franklyn says that had he been able to negotiate his taxes, they would be thirty-five to forty-five percent less. (*Id.*)

Regarding property taxes, Franklyn states that during the "entire life of the mortgage between [himself] and Harbour Portfolio VI, LP," Harbour Portfolio did not pay any property taxes. (Compl. at 7.) Instead, Franklyn paid taxes, and submitted them to Defendants "RECA/National Asset Advisors." (Compl. at 7–8.) Franklyn says that "[t]his deception" made it clear to Franklyn that either Harbour Portfolio diverted the funds he submitted to pay property taxes "or the [P]roperty may not be owned by [Fannie Mae]." (Compl. at 8.)

Franklyn also makes much of how the Property came to be Harbour Portfolio's. In October 2009, the Property was purchased at a sheriff's sale by non-party BAC Home Loans Servicing, L.P., for about $92,000. (FNMA's Mot. at PID 213, Sheriff's Deed.) BAC then deeded the home—Franklyn stresses that BAC did so for only $1.00 (Compl. at 8, 21)—to Fannie Mae on November 4, 2009. (FNMA's Mot. at PID 220, Quit Claim Deed.) Then on

January 27, 2011, Fannie Mae deeded the Property to Harbour Portfolio for $4,958. (FNMA's Mot. at PID 223, Covenant Deed.) Franklyn says that the deed identified Fannie Mae as Grantor but did not identify the Grantee, which is "the first known document fraud between Defendants." (Compl. at 14.) Although the deed does not identify the Grantee, it does say that Fannie Mae "conveys and warrants" the Property to "Harbour Portfolio VI, LP." (FNMA's Mot. at PID 223, Covenant Deed (capitalization altered).)

Franklyn maintains that BAC and Fannie Mae transferred the Property and associated loan as part of a scheme to eliminate poor-performing loans from their books and therefore appear financially fit. (Compl. ¶¶ 16–17.) It appears that Franklyn maintains that, under this scheme, unwitting investors, like him, maintain the home and provide for its upkeep while BAC and Fannie Mae somehow profit. (Compl. ¶¶ 23, 29.) Franklyn points to a statement on National Asset Advisors' website: "Strategy is to keep holding costs, such as real estate taxes, yard care and home maintenance, to a minimum, while generating revenue as quickly as possible." (Compl. at 14.) He also says that Fannie Mae and BAC "intend to use" Harbour Portfolio "to manage low end, non-performing loans while technically removing them from their respective balance sheets," (Compl. ¶ 15), and Harbour Portfolio "and its partners dupe the customers into a mortgage where the customers assume[] the responsibility and upkeep of the property" (Compl. ¶ 27). He says that "[t]he fraud is misleading of the customer into caring for the asset secures it for the A/B entity, . . . knowing [full] well that the holding entity never means to complete the selling transaction." (Compl. ¶ 29.)

Franklyn says that "Defendants'" "ill will" was evident when on August 13, 2013, Defendant Clos, an attorney employed with Defendant WWR, filed a suit in Michigan's 36th District Court "for possession after land contract forfeiture." (Compl. at 8.) Franklyn says, "This

4

complaint contained a principal balance due of $4,711,094.00." (*Id.*) The state-court complaint sought to recover possession of the Property and "listed a material breach of contract violation for nonpayment of taxes and insurance." (Compl. at 9.) The complaint also listed Franklyn's address as 15871 Kentucky in Detroit, Michigan, rather than the address of the Property. (Compl. at 9–10.) "The complaint for possession after land contract forfeiture never lists . . . Penrod Detroit, MI . . . as the address of the home in question." (Compl. at 10.) None of Franklyn, WWR, Clos, or Fannie Mae has provided the Court with a copy of the state-court complaint.

Apparently as a result of Clos' use of the 15871 Kentucky address, Franklyn was not served with the complaint, and the state court entered a default judgment against him for his non-appearance. (*See* Compl. at 11.) "[O]n or about August 30, 2013," Franklyn checked the mail at 15871 Kentucky and found a copy of the judgment. (*Id.*)

Franklyn then sought to set the default judgment aside. (*Id.*) At the hearing on Franklyn's motion, Franklyn asserted that the $4.7 million figure was error and that the 36th District Court lacked jurisdiction given that amount-in-controversy. (Compl. at 11–12.) The state court denied Franklyn's motion. (Compl. at 12.) Franklyn appealed. (Compl. at 12.) The appeal was dismissed on Harbour Portfolio's motion. (Compl. at 12–13.)

**B.**

In March 2014, Franklyn filed this suit naming six defendants: Federal National Mortgage Association; Harbour Portfolio VI, LP; National Asset Advisors, LLC; RECA Properties, LLC; Weltman Weinburg, and Reis, Co., LPA; and William Clos. (*See generally* Compl.)

In April 2014, WWR and Clos each filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Following its May 2014 answer, Fannie Mae filed a motion for judgment on the pleadings pursuant to Rule 12(c) and for summary judgment under Rule 56.

## II.

Under the plausibility standard articulated in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), when a defendant moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court can first cull legal conclusions from the complaint, leaving only factual allegations to be accepted as true. *Iqbal*, 556 U.S. at 679. The inquiry then becomes whether the remaining assertions of fact "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678. Although the plausibility threshold is more than "sheer possibility that a defendant . . . acted unlawfully," it is not a "'probability requirement.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). Whether a plaintiff has presented enough factual matter to "'nudg[e]'" his claim "'across the line from conceivable to plausible'" is "a context-specific task" requiring this Court to "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 683 (quoting *Twombly*, 550 U.S. at 570).

Fannie Mae's Rule 12(c) motion is also governed by this standard. *See Daily Servs., LLC v. Valentino*, 756 F.3d 893, 898 (6th Cir. 2014).[1]

---

[1] Because Franklyn's Complaint does not state a claim against Fannie Mae, the Court does not look beyond the Complaint (and materials referred to in the Complaint and central to its claims) to address Fannie Mae's alternate motion for summary judgment. *See* FNMA's Mot. at 1, 4. In any event, the sole evidence Franklyn has submitted is an "affidavit," but it is not signed or notarized and, therefore, is not summary-judgment evidence. *See Sfakianos v. Shelby Cnty. Gov't*, 481 F. App'x 244, 245 (6th Cir. 2012); *Pollock v. Pollock*, 154 F.3d 601, 612 n.20 (6th Cir. 1998).

### III.

After Franklyn filed his pro se Complaint, and after WWR, Clos, and Fannie Mae filed their dispositive motions, Franklyn obtained counsel. (Dkt. 30.) Through counsel, Franklyn informs that he only asserts two counts against WWR and Clos: Count I, a Fair Debt Collection Practices Act ("FDCPA") claim, and Count VI, a Racketeer Influenced and Corrupt Organizations Act ("RICO") claim. (Dkt. 36, Pl.'s Resp. to WWR's Mot. at 3; Dkt. 37, Pl.'s Resp. to Clos' Mot. at 3.) Similarly, he "requests this Honorable Court grant [Fannie Mae's] Motion as it relates to Counts II – V, VII, VIII, X – XII, and XIV – XVIII," (Pl.'s Resp. to FNMA's Mot. at 10), with the caveat that the allegations in these counts "are applicable to other [c]ounts," (*id.* at 5–9). The Court will grant Franklyn's request. Accordingly, the Court will only consider Count I (FDCPA), Count VI (RICO), Count IX (breach of contract), and Count XIII (quiet title) as alleged against Fannie Mae, and only Counts I and VI against WWR and Clos.

The Court turns first to WWR and Clos' claim that this Court lacks subject-matter jurisdiction over the claims against them. It then examines Franklyn's FDCPA, RICO, breach-of-contract, and quiet-title claims.

### A.

Although Franklyn's Complaint includes counts based on federal law, WWR and Clos contend that this Court lacks subject-matter jurisdiction over Franklyn's claims against them because those claims ask a federal district court to review a state-court judgment. (WWR's Mot. at PID 119-20; Clos' Mot. at PID 144–45); *see also Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923); *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983). The Court disagrees.

"*Rooker* and *Feldman* exhibit the limited circumstances in which [the Supreme] Court's appellate jurisdiction over state-court judgments, 28 U.S.C. § 1257, precludes a United States

district court from exercising subject-matter jurisdiction in an action it would otherwise be empowered to adjudicate under a congressional grant of authority." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291 (2005). Thus, the scope of the *Rooker–Feldman* doctrine is not the same as claim or issue preclusion—it does not apply simply because a state-court has already adjudicated a claim later asserted in federal court. *Exxon Mobil*, 544 U.S. at 293. Nor does it apply whenever a federal court's resolution of a claim would deny a prior state-court legal conclusion. *Id.*

District courts in this Circuit have been instructed to focus on the source of the injury as alleged:

> If the source of the injury is the state court decision, then the *Rooker-Feldman* doctrine would prevent the district court from asserting jurisdiction. If there is some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim. . . . The key point is that the source of the injury must be from the state court judgment itself; a claim alleging another source of injury is an independent claim.

451 F.3d 382, 393–94 (6th Cir. 2006); *see also Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 87–88 (2d Cir. 2005) ("[F]ederal plaintiffs are not subject to the *Rooker–Feldman* bar unless they complain of an injury caused by a state judgment.").

Here, the injuries alleged in Franklyn's FDCPA count, at least those attributable to WWR and Clos, do not stem from the state-court judgment. It appears that Franklyn's FDCPA claims against these two Defendants are based on two acts: (1) Clos falsely stated in the state-court complaint that the principal and interest due was over $4.7 million, and (2) Clos incorrectly filed for "forfeiture rather than a foreclosure." (Compl. ¶¶ 9, 14.) It is true that if this Court (or a jury) were to find Franklyn correct on these points, the validity of the state-court judgment would be in question. But that does not mean Franklyn's FDCPA claim based on these assertions stems from that judgment. To the contrary, Franklyn could presumably have filed his FDCPA claim for

8

these allegedly wrongful acts if the state court action had been dismissed or was still pending. *See Exxon Mobil*, 544 U.S. at 293 ("If a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." (internal quotation marks, alterations, and citation omitted)).

As for Franklyn's RICO claim, that cause of action is difficult to decipher (a point discussed more below). But whatever its precise basis, the claim appears to rest primarily on WWR and Clos' pre-state-court-judgment conduct:

> Borrowers of FANNIE MAE underwritten and HARBOUR VI, LP instituted mortgages[,] and/or whose mortgages are serviced by any of HARBOUR VI, LP entities or those debts collected by RECA, NATIONAL ASSET ADVISORS, WELTMAN, WEINBERG, and REIS, LLC against people such as Plaintiff[,] ha[ve] suffered a loss as a result of the Defendant[s] and their actions, in that they paid money for mortgages or mortgage servicing that they would not otherwise have, absent RECA/HARBOUR VI, LP's deceptive marketing practices through especially, RECA and the threats of HARBOUR PORTF[OLIO] VI, LP WELTMAN, WEINBERG, and REIS, LLC.

(Compl. at 35.)

As such, the *Rooker-Feldman* doctrine does not apply to Franklyn's two claims against WWR and Clos.

## B.

WWR, Clos, and Fannie Mae each assert that Franklyn has not sufficiently pled a violation of the Fair Debt Collection Practices Act as against them.

## 1.

WWR and Clos argue that Franklyn's FDCPA claim fails because he has not pled that they were attempting to collect a "debt." (WWR's Mot. at 122; Clos' Mot. at PID 147.) The FDCPA defines a "debt" as "arising out of a transaction in which the money, property, insurance,

or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5). WWR and Clos say that "the [C]omplaint contains allegations that would suggest the possibility that Plaintiff's obligation associated with acquisition of the [Property] was not a consumer debt but was commercial in nature." (WWR's Mot. at PID 122; Clos' Mot. at PID 147.) They point out that Franklyn's address listed in both the state-court complaint and the one filed here is not the address of the Property. (WWR's Mot. at PID 122; Clos' Mot. at PID 147.) WWR and Clos further note that Franklyn pleads that a "Lisa Micou" was an "occupant" of the Property, suggesting that it was not his home. (WWR's Mot. at PID 122; Clos' Mot. at PID 147.)

WWR and Clos misstate the relevant standard. On a Rule 12(b)(6) motion, this Court does not concern itself with whether it is "possible" that the debt was commercial in nature. The question is whether the Complaint permits the reasonable inference, *see Iqbal*, 556 U.S. at 678, that the debt arose from a transaction primarily for personal purposes, *see* 15 U.S.C. § 1692a(5). It does. The very first sentence of the first substantive section of the Complaint says, "This . . . action brought by the Plaintiff, Kevin Franklyn arises from the Defendants' scheme to defraud the Plaintiff detailed within this claim, to his right to liberty, life *and his home*." (Compl. at 3 (emphasis added).) Franklyn also pleads that "he was meant solely to [be a] place hold[er] [for] the house, maintain the property as a home, and pay the taxes until the market rebounds." (Compl. at 14.) Discovery might reveal that the Property was an investment for Franklyn and not his residence. But on the facts alleged, the reverse is plausible. Franklyn thus adequately alleges a "debt" under the FDCPA.

WWR and Clos next say that Franklyn's FDCPA claim does not allege that they were engaged in "debt collection" under the Act. Relying on *Bobo v. Trott & Trott, P.C.*, No. 13-

14696, 2014 WL 555201 (E.D. Mich. Feb. 12, 2014), WWR and Clos imply that the state-court proceedings were not debt collection because they sought possession. *See Bobo*, 2014 WL 555201, at *2 (finding that the defendant "was not attempting to collect a debt when it sent Plaintiff the notice to vacate and initiated eviction proceedings"). WWR and Clos are correct that Franklyn asserts that the state-court action was "a complaint for possession after land contract forfeiture." (Compl. at 8.) And he pleads that the "complaint intended to recover possession of the [P]roperty." (Comp. at 9.) But Franklyn also alleges that "[t]he complaint . . . listed a material breach of contract violation for nonpayment of taxes and insurances." (Compl. at 9.) It is thus plausible that the state-court action was more than a proceeding for possession following a sheriff's sale. *See Glazer v. Chase Home Fin. LLC*, 704 F.3d 453, 464 (6th Cir. 2013) (holding that "mortgage foreclosure is debt collection under the Act"). As such, the Court will not dismiss Franklyn's FDCPA on this basis.

Finally, WWR and Clos argue that "[w]ithin Count I, Plaintiff has offered only conclusory allegations of violations." (WWR's Mot. at PID 123; Clos' Mot. at PID 148.) The Court agrees with WWR and Clos that the Complaint is difficult to follow and it would be helpful if Franklyn had provided additional explanation as to the factual basis of some of his FDCPA claims. Nonetheless, because Franklyn was pro se when the Complaint was filed, the Court declines at this time to dismiss Franklyn's claims that WWR and Clos violated 15 U.S.C. §§ 1692e and 1692f. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (noting pro se complaints should be "liberally construed" and held to "less stringent standards" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976))).

Franklyn has alleged at least two false statements by WWR and Clos. The first relates to the amount of the debt. According to Franklyn, the Truth in Lending statement associated with

the Note provided that his mortgage was for $44,925.00. (Compl. at 5.) In contrast, Franklyn alleges that the state-court complaint alleged that he owed $4,711,094 in principal and interest. (Compl. at 12 & ¶ 13.) Second, Franklyn alleges that "Defendants[] did willfully conceal from the Plaintiff, what amounted to excessive, fees, principal, and/or interests totaling $4,711,094.00" and cites § 1692e. (Compl. ¶¶ 8–9.) He also says, "Defendants imposed and/or collected service charges in the . . . course of collection debts from Plaintiff, even though such amounts were not expressly authorized by HARBOUR VI LP's mortgage contracts with Plaintiff, or permitted by law, in violation of 15 U.S.C. 1692f(1)." (Compl. ¶ 11.) Reading all of this together in the light most favorable to Franklyn, Franklyn alleges that the state-court complaint falsely stated that the amount he owed Harbour Portfolio was over $4.7 million, and that the attorney fees, principal, interest, and costs that purportedly totaled that amount were kept from him during loan servicing or other proceedings leading to the state-court complaint. Thus, WWR and Clos have not shown that Franklyn's §§ 1692e and 1692f claims are implausible. *See* 15 U.S.C. § 1692e(2) ("[T]he following conduct is a violation of this section . . . [t]he false representation of . . . (A) the character, amount, or legal status of any debt; or (B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt."); 15 U.S.C. § 1692f(1) ("[T]he following conduct is a violation of this section: (1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."); *see also Crugher v. Prelesnik*, 761 F.3d 610, 614 (6th Cir. 2014) ("The defendant has the burden of showing that the plaintiff has failed to state a claim for relief."). Indeed, WWR and Clos do not even address the requirements of

12

§§ 1692e or 1692f in their motions. (*See* WWR's Mot. at PID 121–23; Clos' Mot. at PID 146–48.)

The same holds for Franklyn's reliance on 15 U.S.C. § 1692g (Compl. ¶ 13)—WWR and Clos also fail to discuss that section or its requirements in their motions. But the allegations in the Complaint show that Franklyn has not pled a plausible claim under § 1692g. The Complaint avers, "KEVIN FRANKLYN did inform, at the hearing dated, October 3, 2013 the Defendants' counsel and the Hon. Demetria Brue of the excessive nature of the principal and interest due calling it, 'judgment.' Then, further informed the Court, ' . . . he believed the amount $4,711,094 to be an error . . .' thereby giving notice to plaintiff's counsel (15USC1692g)." (Compl. ¶ 13.) Apparently Franklyn relies on subsection (b) of § 1692g, which essentially provides that if a consumer disputes a debt within thirty days of receiving notice contemplated by subsection (a), debt collection must cease until the collector verifies the debt. It is implausible that WWR or Clos violated 1692g(b) at least because Franklyn first learned of the $4.7 million figure when he received the default judgment in the mail on August 30, 2013, and the state-court hearing was not until October 3, 2013—more than thirty days later. Moreover, § 1692g does not contemplate oral notice, and Franklyn has not pled written notice. His allegation is merely that he informed Clos at the hearing that the figure was incorrect. (Compl. ¶ 13.) Franklyn's claim that WWR or Clos violated § 1692g is thus implausible.

WWR and Clos do specifically address 15 U.S.C. § 1692i, and the Court agrees with them that Franklyn has not pled a claim under that section of the FDCPA. That section pertains to the venue in which a debt collector may sue a debtor: "Any debt collector who brings any legal action on a debt against any consumer shall—(1) in the case of an action to enforce an interest in real property securing the consumer's obligation, bring such action only in a judicial

district or similar legal entity in which such real property is located." 15 U.S.C. § 1692i. The Complaint alleges that the Property is located in Detroit and that WWR and Clos (on behalf of Harbour Portfolio) sued in Michigan's 36th District Court. That state district court serves the City of Detroit. *See* Michigan's 36th District Court Website, http://www.36thdistrictcourt.org/ education.html (last visited Dec. 15, 2014). It is thus implausible that WWR and Clos violated 15 U.S.C. § 1692i by filing the state-court action in 36th District Court.

In sum, WWR and Clos have not carried their burden in demonstrating that it is implausible on the facts alleged that they violated 15 U.S.C. §§ 1692e and 1692f. And although they have also failed to discuss § 1692g, the Complaint itself makes apparent that Franklyn has not pled a claim under that section of the FDCPA. The Court will, however, dismiss this claim without prejudice. WWR and Clos have carried their burden with respect to Franklyn's claim under § 1692i. This claim will thus be dismissed with prejudice.

## 2.

The plausibility of Franklyn's Fair Debt Collection Practice Act claim against Fannie Mae would appear to present a straightforward analysis: he never names Fannie Mae in that count. (*See* Compl. ¶¶ 1–14.) Indeed, Franklyn specifically pleads that Harbour Portfolio and WWR are "debt collectors" within the meaning of the Act, (Compl. ¶¶ 2–3), while conspicuously omitting a comparable allegation about Fannie Mae. He does allege conduct by "Defendants" as violating the FDCPA (*e.g.*, Compl. ¶¶ 6, 8, 10), but the use of that generic term does not give Fannie Mae fair notice of its allegedly wrongful conduct in a case involving six defendants with different roles. *See Coleman v. Gullet*, No. 12-10099, 2013 WL 4026839, at *8 (E.D. Mich. Aug. 6, 2013) (citing cases), *report and recommendation adopted*, 2013 WL 5172306 (E.D. Mich. Sept. 13, 2013). Fannie Mae reasonably asserts, "There are no allegations pertaining to Fannie

14

Mae and the [FDCPA] Count should be dismissed for failure to state a claim." (FNMA's Mot. at 5.)

Franklyn responds by arguing that he pled that Fannie Mae is the "underlying lender." (Pl.'s Resp. to FNMA's Mot. at 4–5.) But even if the Court were to find that Fannie Mae held the debt at the time of the alleged FDCPA violations, creditors are generally not "debt collectors" under the Act because a creditor suffers business consequences if it duns those who borrow from it. *See* 15 U.S.C. § 1692a(4), (6)(F); S. Rep. No. 95–382, at 2 (1977). Recognizing this, Franklyn points to 15 U.S.C. § 1692a(6). (Pl.'s Resp. to FNMA's Mot. at 4–5.) That paragraph provides: "the term [debt collector] includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts." 15 U.S.C. § 1692a(6). This paragraph of the Act does not help Franklyn because he did not plead that Fannie Mae used Harbour Portfolio or WWR as a mere conduit to collect debts, when Fannie Mae was in fact the entity driving the collection. *See Vincent v. The Money Store*, 736 F.3d 88, 103 (2d Cir. 2013) ("[W]hen determining whether a representation to a debtor indicates that a third party is collecting or attempting to collect a creditor's debts, the appropriate inquiry is whether the third party is making bona fide attempts to collect the debts of the creditor or whether it is merely operating as a 'conduit' for a collection process that the creditor controls."); *cf. Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 360 (6th Cir. 2012) (noting—where neither defendant was a creditor—that "the [Plaintiffs] have alleged that they received collection letters regarding [Plaintiff] Lisa Bridge's mortgage from an agent or arm of Defendants, the law firm of Moss, Collis, Stawiarski, Morris, Schneider and Prior, LLC. For the purposes of a 12(b)(6) motion, this allegation may also bring Defendants within the statutory definition of a debt collector under the second sentence of § 1692a(6).").

In short, Franklyn has not pled a FDCPA claim against Fannie Mae because he has not adequately pled that Fannie Mae is a debt collector within the meaning of the Act. Under his theory, Franklyn needed to set forth factual matter permitting the reasonable inference that Fannie Mae both held the debt at the time of the alleged FDCPA violations and was attempting to collect on that debt through the conduit of Harbour Portfolio or WWR. The Complaint does neither.

### C.

Count VI of the Complaint asserts a Racketeer Influenced Corrupt Organizations Act violation against Defendants Harbour Portfolio, RECA Properties, National Asset Advisors, and two Defendants presently moving for dismissal: WWR and Fannie Mae. (Compl. ¶ 63.)

The Racketeer Influenced Corrupt Organizations Act states in part,

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). To state a RICO claim, Franklyn must allege facts making each of the following plausible: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity," *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).

A RICO "enterprise includes any union or group of individuals associated in fact . . . for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 944 (2009). The association must have structure, meaning "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946. An "association in fact" enterprise requires "an ongoing organization, formal or informal," with the various associates functioning as a "continuing unit."

16

*United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981). A "properly pled RICO claim must cogently allege activity that would show ongoing, coordinated behavior among the defendants that would constitute an association-in-fact." *Frank v. D'Ambrosi*, 4 F.3d 1378, 1386 (6th Cir. 1993).

A "pattern of racketeering activity" requires "at least two predicate acts of racketeering activity occurring within a ten-year period." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006). The predicate acts of racketeering activity are identified in 18 U.S.C. § 1961(1)(B). *See Otworth v. Budnik*, No. 14-1139, 2014 WL 6610446, at *2 (6th Cir. Nov. 21, 2014); *Slorp v. Lerner, Sampson & Rothfuss*, No. 13-3402, 2014 WL 4800100, at *14 (6th Cir. Sept. 29, 2014). Moreover, "the term pattern itself requires the showing of a relationship between the predicates and of the threat of continuing activity. It is this factor of *continuity plus relationship* which combines to produce a pattern." *H.J., Inc. v. Northwestern Bell Tele. Co.*, 492 U.S. 229, 238 (1989) (emphasis in original).

Franklyn has not adequately pled a RICO claim. As an initial matter, it is doubtful that he has adequately pled the "enterprise" element. Plaintiff simply alleges that "Defendants' actions and use of multiple corporate entities, multiple parties, and concerted and predetermined acts and conduct specifically designed to defraud Plaintiff constitutes an 'enterprise,' with the aim and objective of the enterprise being to perpetrate a fraud upon the Plaintiff using intentional nondisclosure, material misrepresentation, and creation of fraudulent loan documents." (Compl., ¶ 66.) In other words, as in *Begala v. PNC Bank, Ohio*, 214 F.3d 776, 781 (6th Cir. 2000), "the complaint essentially lists a string of entities allegedly comprising the enterprise, and then lists a string of supposed racketeering activities in which the enterprise purportedly engages." The Complaint is devoid of facts suggesting that the behavior of the listed entities is "coordinated in

such a way that they function as a continuing unit." *Id.* While the Court thus has serious doubts about the adequacy of this pleading, the definition of enterprise is broad and thus, the Court will analyze the other elements.

Franklyn states that WWR received revenue from collecting debts or foreclosing mortgages on behalf of Harbour Portfolio. (Compl. ¶ 67.) Franklyn also says that Harbour Portfolio (1) generated revenue "from trades resulting from underwritten losses of certain assets, especially [the Property]"; (2) received profits from loan servicing; and (3) received a "percentage share of gross proceeds" from RECA, National Asset Advisors, and WWR's debt collection. (Compl. at 68.) It is not clear which, if any, of the "dozens of crimes that constitute racketeering activity," *Slorp*, 2014 WL 4800100, at *14, this conduct implicates. Further confusion arises because Franklyn pleads, "Each of the RICO Defendants has received income derived, directly or indirectly, from the pattern of racketeering activity described in and throughout each count," (Compl. ¶ 64), thereby apparently referencing the allegations in all 165 paragraphs of the Complaint. Moreover, in his response to Fannie Mae's motion, Franklyn states, "Fannie Mae is the central actor in the allegations made under RICO," (Pl.'s Resp. to FNMA's Mot. at 6); but this is confusing because, as discussed, it appears that Fannie Mae had no interest in the Property following January 2011.

It is not the responsibility of the Court or Defendants to sift through Franklyn's Complaint to uncover which alleged conduct Franklyn intended to be the predicate acts amounting to a pattern of racketeering activity. *See* Fed. R. Civ. P. 8 ("A pleading that states a claim for relief must contain[] . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). This is especially so where Franklyn himself requests "that he be

18

permitted to submit an Amended Complaint that will more clearly outline the organization of and the actions taken by the enterprise." (Pl.'s Resp. to FNMA's Mot. at 6.)

As such, Franklyn's RICO claim will be dismissed without prejudice as to WWR and Fannie Mae, and Franklyn will be given leave to file an amended complaint to clarify his RICO claim if he believes, pursuant to Federal Rule of Civil Procedure 11, that the facts of this case warrant allegations of racketeering activity. Additionally, Franklyn's right to amend is without prejudice to WWR's, Clos', or FNMA's right to move to dismiss the amended RICO claim.

**D.**

In support of his breach-of-contract claim, Franklyn states, "Fannie Mae is a party to the mortgage loan contract. The other Defendant, Harbour Portfolio, according to Kevin Franklyn, is Fannie Mae's agent. (Affidavit of Kevin Franklyn)." (Pl.'s Resp. to FNMA's Mot. at 7.) Franklyn cannot rely on an affidavit to oppose a motion for judgment on the pleadings. *See King v. Henderson*, 230 F.3d 1358 (table), 2000 WL 1478360, at *4 (6th Cir. 2000) ("King has asserted that the trial judge legally erred by dismissing her complaint under Rule 12(b)(6) because he had resorted to affidavits and documentary proof beyond the pleadings as support for his conclusion that King had not alleged a sustainable cause of action, whereas Rule 12(b)(6) contemplates assessment only of the sufficiency of the allegations contained within the complaint. King's protest is well taken."); *Ypsilanti Cmty. Utilities Auth. v. MeadWestvaco Air Sys., LLC*, No. 07-CV-15280, 2008 WL 2610273, at *2 (E.D. Mich. June 30, 2008) ("[T]he Court declines to consider Plaintiffs' supplemental affidavit, attached to its response to the motion to dismiss, for the reason that the submitted affidavit is a 'matter outside the pleadings' for the purposes [of] the Defendant MWC's Rule 12(b)(6) motion."). And to the extent that Franklyn relies on paragraph 111 of his Complaint—that "each of the Defendants[] sued herein

was the agent and employee of each of the remaining Defendants[] sued herein"—that allegation is conclusory and the Court does not accept it as true. *See Iqbal*, 556 U.S. at 679. Moreover, as noted, Franklyn's "affidavit" is unsigned and not notarized and thus is not competent summary-judgment evidence.

Turning to the Complaint, although Franklyn pleads that he and "the Defendants[]" entered into a mortgage, he specifically alleges a "PURCHASE MONEY NOTE between . . . HARBOUR VI, LP and . . . KEVIN FRANKLYN" and references "HARBOUR VI LP's mortgage contracts with Plaintiff." (Compl. at 4 & ¶¶ 9, 19.) Indeed, his breach-of-contract count specifically states, "Plaintiff entered into a binding contract with HARBOUR VI, LP regarding the origination and/or servicing of their loans." (Compl. ¶ 101.)

Because the factual allegations in the Complaint do not permit the reasonable inference that Franklyn had a contract with Fannie Mae, his claim that Fannie Mae breached is implausible. *See Kogelshatz v. Gendernalik Funeral Home, Inc.*, No. 293977, 2010 WL 4628678, at *7 (Mich. Ct. App. Nov. 16, 2010) ("Because no contract existed, there can be no breach . . . .").

The Court will, however, dismiss this claim without prejudice. Franklyn's "affidavit" provides that Harbour Portfolio held itself out to be Fannie Mae's agent and that at all times he understood that Fannie Mae owned the Property and that Fannie Mae was his lender. (Pl.'s Resp. Ex. A., Franklyn Aff. ¶¶ 3, 11, 12.) Again, the Court will give Franklyn the opportunity, within the confines of Federal Rule 11, to plead facts showing a plausible contractual relationship between himself and Fannie Mae.

20

**E.**

In his response to Fannie Mae's motion, Franklyn states, "[t]o the extent that Fannie Mae does have an interest in the property by and through its agents, Plaintiff seeks to Quiet Title as to Fannie Mae." (Pl.'s Resp. to FNMA's Mot. at 8.) But Fannie Mae does not claim any interest in the Property. (FNMA's Mot. at 15 ("Fannie Mae does not claim an interest in the Subject Property, thus, it is impossible for Plaintiff to attempt and quiet title against Fannie Mae."); FNMA's Reply at 3 ("Plaintiff utterly ignores the documented fact that Fannie Mae conveyed its interest in the Subject Property well prior to Plaintiff ever having any interest at all in the Subject Property.").) Accordingly, Franklyn's quiet-title claim against Fannie Mae will be dismissed.

**IV.**

For the foregoing reasons, the Court orders as follows.

To the extent that any count other than Counts I and VI was pled against WWR and Clos, Franklyn has abandoned those counts and they are DISMISSED WITH PREJUDICE. To the extent that Count I alleges that WWR or Clos violated § 1692i of the FDCPA, that claim is DISMISSED WITH PREJUDICE. To the extent that Count I alleges that WWR or Clos violated 15 U.S.C. § 1692g of the FDCPA, that claim is DISMISSED WITHOUT PREJUDICE. To the extent that Count I alleges that WWR or Clos violated 15 U.S.C. §§ 1692e or 1692f, WWR's and Clos' motions to dismiss Count I are DENIED WITHOUT PREJUDICE. Count VI (RICO) as against WWR and Clos is DISMISSED WITHOUT PREJUDICE to Franklyn's right to file an amended complaint.

To the extent that any count other than Counts VI and IX was pled against Fannie Mae, those counts as against Fannie Mae are DISMISSED WITH PREJUDICE. Count VI (RICO) and

Count IX (breach of contract) as against Fannie Mae are DISMISSED WITHOUT PREJUDICE to Franklyn's right to file an amended complaint.

Franklyn has twenty-one days from the entry of this order (January 27, 2015) to file an amended complaint. Franklyn is advised to clarify all claims not dismissed. All claims must be pled in good faith. The Court does not grant Franklyn leave to add new causes of action.

The Court hereby orders all parties to appear for a status conference to discuss mediation procedures on **February 12, 2015 at 2:00 p.m.**

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  January 6, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 6, 2015.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson